John Dudry appearing for Thunderbird, the Plaintiff and Appellant. The briefs range pretty widely across the ripeness issue into the takings issue. And there's a reason for that. But we're here about ripeness. And my client's position is that both as a matter of federal and state law, the claim is ripe. I think the key term in Judge Mossman's order adopting the findings and recommendations was that no quote-unquote application to develop or application for permission to develop was ever made. And I'll go through the reasons why we think that was erroneous. In the first place, this involves the city's adoption and three subsequent extensions of a development moratorium. The Oregon statute is clear that the way to challenge the moratorium is to file an appeal with the Land Use Board of Appeals, LUBA, which then can either approve or invalidate the moratorium. The city's argument, if it assumes that Thunderbird should have done something else during that review period as opposed to doing something else after the moratorium was invalidated, is that Thunderbird should have gone to the city to get a building permit, which is a non-discretionary process, for some use that would have been within the restrictions of the ordinance. And the problem with that is the summary judgment record shows that the property was no longer viable for use as a hotel, which Thunderbird could have done within the restrictions, but that was not viable. They couldn't change the building, they couldn't tear it down, and they couldn't do anything with it that either increased vehicle traffic during peak hours or required more parking. And this is the D-4 exemption that's referred to. That's done somewhat formulaically. The reference is to a traffic manual, and a hotel of so many rooms is assumed to generate so many vehicle trips. A big box retailer is assumed to generate so many trips based on the square footage. So what Thunderbird would have done would have been to invoke a non-discretionary building permit process to find something that would have fit within those restrictions while it's challenging the validity of the moratorium that imposed the restrictions. And the city points out in opposition to evidence that there was no viable use for the property, well, you could put a laundromat in or a taxidermy shop or a TV repair shop. And Oregon doesn't require that, and I don't believe the Federal cases do either. Well, the Federal cases, particularly Williamson County, requires that you basically, I'll call it exhaust, although that sits uneasily with its 1983 standards. Right, I understand. But Williamson County requires that you show to a fair degree of certainty what the ultimate outcome is going to be if you go through all of the available state procedures. And you haven't even made an initial application, which is why Judge Geldricks and then Judge Mossman said this isn't right. Well, the moratorium itself took away at least some, if not all, of the development rights. And I don't understand. But already when you're right there saying at least some and not all, how can we look at a Federal takings claim until we know the answer to that? Well, so Thunderbird could spend $900,000 and apply for permission to build a $20 million strip mall with at least the possibility that LUBA would invalidate the ordinance that was precluding the more intense development. I don't think the cases require that. And that's why I think the phrase application for development is part of the error below. To clarify, you're saying that the only thing standing between your client and development was the moratorium, that if you wanted to proceed with your plans, there would have been no need for any city permits or anything. It would have been non-discretionary. They would have issued. And it's only the moratorium that was precluding development of the property. That's essentially correct. The moratorium itself, as part of the process, the city was required to adopt a corrective program. And that's part of the moratorium. And that has long outdated the demise of the moratorium. I mean, it's still an issue. But I'd like to go back. The way I say the building permit, which is the only permit that my client could have gotten, is non-discretionary. And that's shown by the Whitlow Declaration and the Basinger Declaration in the record. Essentially, you have to complete a long checklist and have a big check at the end. And once that's done, the city has to say yes. They can't say, oh, we think this should be set back or we don't like the design or that sort of thing. It is non-discretionary. So the goal of requiring the submission of at least one application and its refusal in order to determine what you can do, which is the way the case is put, isn't present here. It certainly wasn't present. And it was wildly impractical. So let's say Thunderbird does spend its $900,000 and gets approval to put in a strip mall, because we'll assume that's not going to generate more vehicle trips than the hotel. But that's not what they want to do. They want to put in big box retailing. But you see, if you're making a regulatory takings case, you've got to show a pretty extraordinary diminution in value as a result of the regulation in order to assess whether you've got a valid regulatory takings claim. We pretty much need to know, or the court deciding is your federal takings claim pretty much needs to know, OK, what's the diminution in value? And until you go through those steps, we don't know. I have to say I do not like Williamson County. I agree with, this might surprise you to learn, with Chief Justice Rehnquist, who says if you give him a chance, he would overrule it. Well, I think at one of these days it will be overruled. But we're stuck with it. Well, I think that what was done, and it was the only way to challenge the moratorium ordinance, satisfies that requirement here. That was the impediment to development. Anything else was nondiscretionary. It was a willingness to pay $900,000 twice if the city has its way, once while the moratorium is pending for something you don't want to build, and then a second time. And so this is an unusual case. And I don't think it fits that paradigm that Williamson describes. I do think as a federal matter it's prudential as well. That's one of the lessons of the McClung case that we cite. And so at least as far as what could have been done while the moratorium was pending is satisfied by the facts of this case. I think that these are – Williamson doesn't sound like it's an absolute rule, but I think it needs to be if you're not appealing to the local government's discretionary powers. And we don't think that's the case. And they're really, for summary judgment purposes, there isn't even a question of material fact on that. I think it's established that it's discretionary. And that's really the heart of the case. I would like to reserve the rest of my time because I know there are going to be more questions after Mr. Thatcher argues. Okay. Why don't we hear from the other side, and then you've saved quite a bit of time. Thank you. Thank you, Your Honor. I'm Terence Thatcher. I'm with the City Attorney's Office. I'm here representing the City of Portland. And I wanted to emphasize at the beginning of my argument that there are two questions before you. The first question is whether this case is ripe under Oregon law, because both an Oregon takings claim and a Federal takings claim were before the district court. And as Williamson would require, the district court first decided, well, is this case ripe under State law? And the State law is fully developed. This is a State with a sophisticated land use system. And the courts have dealt with that on a repeated basis. And they have developed a ripeness test laid out in all the briefs that Thunderbird simply cannot meet, not only need a party seek a first application, as under your cases, the Harrington case, the Kinsley case, Southern Pacific, that group of cases. But you must all ‑‑ if the regulation, in this case the moratorium, is on its face to say, well, we're going to walk in and they're just going to say no, that does not prove futility under Oregon law. That is, you have to take another step, because Oregon has a whole series of land use arrangements. And the next step is you have to ask to have the rule changed that you don't like. That's what the Larson case says. That's what the Doherty case, the Joyce case, the ‑‑ all those cases, all those land use cases, say, affirm that this was not a ripe case. So how does that apply on the facts here? They did ‑‑ their argument, as I understand it, is the only impediment was the moratorium. Yes. And I understand that the ‑‑ the Larson case, they ‑‑ there was no ‑‑ you're saying they had to make an application instead of appealing on the letter? Well, I'm sorry, Your Honor. First, let's be clear that the appeal to the Land Use Board of Appeals is separate from a request for compensation in this case. Wait a minute. I'm just trying to take what you already said. You said have to make an application and then the second step is to ask to change the rule. Absolutely. And what they were doing on the appeal sounds like the second step. They're asking to change the rule, right? They were seeking to have the rule overturned by another decision maker. Yes. The purpose of the ripeness rule in Oregon is to make sure that you have a definitive application of a regulation or a definitive denial to change the regulation by the governmental agency being sued. Okay. So they had to, first of all, make the request for the big box development. Or whatever. Or whatever. And as Judge Fischer pointed out, they could have asked for a half a dozen things. Well, I'm Judge Fischer. I'm sorry. I'm happy to be mistaken for Judge Fischer. We're close. There's a flaw in my argument, isn't there? That's okay. I don't take things personally. I do, and I'm flattered. Okay. The application would have been what, under your theory? As Mr. Dudley says, they would have walked in and asked for a building permit to build something they wanted to build. Okay. And even if it's in his argument, do you agree that it's non-discretionary? Not exactly, Your Honor. Let me explain why. For now, just say, okay, whether it's discretionary. But that would have been the step. That would have been the step. And then if it had been denied. Yes. All right. Then what they would have had to do was request that the city council give them a variance or overrule whoever the permitting authority is. Exactly. Okay. And then if that didn't happen, then their appeal to overturn the or concurrently, is that what you're arguing? Concurrently, they could have sought to remove the moratorium. It could have been done either concurrently or subsequently. And if I may explain the reason, here's the somewhat complicating factor in the Oregon land use system. The Land Use Board of Appeals has the exclusive jurisdiction to review the substance of land use regulations, including moratorium. And a party can challenge the constitutionality of those land use regulations before LUBA and say it is unconstitutional for you to do this, you are taking my property without compensation. But LUBA cannot grant compensation. It can only overturn a regulation if it finds it to be unconstitutional. So in most of the cases that we cite in our rightness, land use rightness cases in Oregon, the parties have first gone to LUBA saying we think that they made mistakes with respect to their substantive land use decision, and if they didn't make mistakes with respect to their substantive land use decision, this is a taking of our property and we want it declared as such. And if and what the courts in all those LUBA cases have said, and I think this is critically important to understand the fallacy of Thunderbird's argument here is, the courts have repeatedly said if you go to LUBA seeking a determination on constitutionality, you still have to go through the normal rightness steps. You have to apply for an application or you can't go to LUBA. You have to have sought a change in the regulations or you can't go to LUBA, raising constitutional issues. So in this case, Thunderbird could have raised all those constitutional issues in LUBA at LUBA, and if LUBA had said this is an unconstitutional measure, then they would have succeeded without compensation. Alternatively, Your Honor, the court can't Can I just stop you at that point? Yes. Okay. Just to clarify. I was you said they could have done it concurrently or sequentially.  And I was about to talk about concurrent. Okay. But you said in order to get to LUBA, they would have to satisfy the permit and the, before they can, but didn't they get to LUBA? They did not raise constitutional issues at LUBA, Your Honor. They had a statutory right to challenge, yes. So you're just saying for unconstitutional purposes. All right. And that's what the Doherty case, the Joyce case, the Larson case, those are all takings cases at LUBA. But concurrently, the State courts have authority under Oregon law to hear takings claims. But in order to bring a takings claim, you have to have a ripe case. And to have a ripe case in Oregon, you have to go through the ripeness step. Thunderbird never went through the ripeness steps in Oregon. And this Court, with all due respect to the presiding judge, who would like to see Williamson overturned. I think you rather like Williamson. This Court is not here to decide whether Oregon courts are right or not in ripeness. That's Fletcher. I said presiding judge, so I didn't get the name wrong this time. Judge Jones. Nice to meet you. But so we don't have a ripe State case. That was your first claim. If you haven't pursued seeking compensation in the State, you can't come to the Federal court and ask for Federal compensation because you haven't gone through the State procedure. That's the first reason that we don't have a ripe Federal case, because Thunderbird hasn't gone through those procedures. I want to respond, by the way, to a couple of points that Mr. Dudley made on the State and Federal issue. He emphasizes that, in his view, most of the cases that require exhaustion, that is, require going through the ripeness step, are cases where somehow the local government still has discretion under the rules. That is not correct. Indeed, most of the cases cited in a brief from the State of Oregon are cases where the rule said, thou shalt not build a house on this farmland. Thou shalt not build a dwelling in forest land. There are absolute prohibitions under Oregon's Goal 3 and Goal 5. And the State court said, well, there doesn't appear to be discretion, but you still have to make that application for the reasons that Judge Fletcher pointed out, which is because we have to understand the scope both of the regulation, we have to give the decision-maker the ability to make a specific decision related to a specific piece of property. This is an as-applied case, by the way. And we have to know the scope of the potential taking. And until you make an application, we don't know that. And that is spelled out in the Larson case, and I would refer you also to the discussion by this Court in the Kinsley case, where the district court basically did what Thunderbird wants. The district court said, well, these are pretty tough regulations, and it looks to me like there's no economic use. That is Mr. Dugby's concern. There's just no economic use left here that we can apply for. And the district court in Kinsley said, well, I tend to agree there's no economic use, so it's the right case. And the Ninth Circuit overturned it, explained, as the presiding judge explained, that, no, we have to have an actual decision, a specific piece of property, and we have to understand the scope of the taking. You can't try and predict what will happen when the local government gets an actual application. That is not rightness. Kennedy. So if who provides compensation? If this had gone through the process you say should happen, LUBA says that the moratorium's illegal as a matter of statutory law. So now what they'd do is go to the Portland Permitting Authority, then get denied a permit, let us say, and then they would go to the Portland City Council to override, and then where would they go to get the compensation determination? Well, the compensation determination is clearly made in our circuit court, the county circuit courts, the trial courts. So then they could file a takings type of action in the Oregon court, and then it would be like an inanimate domain dispute and so on and so forth. Yes. And if they were substantively denied compensation in state court, then they could come to you and say, well, we think there's a Federal taking because we were denied state compensation. You know, on that last point, you're probably wrong. Have you read Santorini Hotel? Yes, I have. Well, Your Honor, it's to say once you're done in state court, you're almost certainly not allowed to come to Federal court. If the standards are the same, there are race judicata issues clearly. No. And you have the right to raise your Federal claim. It's worse than that. Even if the standards are different, if the state court is jurisdictionally competent to entertain a Federal takings claim and that claim is not brought in state court, it's use it or lose it and you're done, which is why I really don't like Williamson County, but there it is. Yes, Your Honor, you're absolutely right, and I misspoke. The Supreme Court has said that you can be barred if you don't bring it in the first instance. Yes. Absolutely. But may I finally say that there's another reason this case isn't ripe, and the simplest reason this case isn't ripe in the Federal jurisdictional sense, and it is what we were talking about before we started talking – what you were talking about before we started talking about in the state ripeness doctrine. Your own cases say there has to be at least one meaningful application. That's this Court's law. Harrington, Kinsley, Cuyahoga, Southern Pacific, all those cases, you have repeatedly rejected parties that come in and ask you to predict the outcome of a process that the parties have not even commenced. So for those reasons, Your Honor, and with all due respect to the difficulties that this may cause, or may cause you in sorting through the Williamson County cases, the fact of the matter is we are all living with Williamson County and this  And so we are all living with Williamson County and those other cases, and there is no ripe case here, and Judge Mossman did not err. Thank you. Your response? You've saved some time. Thank you. I've got my outline back. The problem isn't that the city might have said no. The problem is that the city will say yes. It's what would it say yes to. Now, Mr. Thatcher brought up an additional scenario that I didn't discuss previously, and that is, well, why didn't Thunderbird go to the city permitting authorities with another big box scheme? Well, talk about futile. The moratorium itself, which is in the excerpts of record, doesn't give the city discretion to go outside their six exemptions, one of which has been briefed. I mean, there's no doubt the answer would have been no. And what I don't see in the cases that are briefed, including Joyce, Curran, Larson, and Boise Cascade 5, there were six appellate opinions in that one, what I don't see in those cases is an application for a nondiscretionary permit. In every case, there's a permit that, I mean, discretion is exercised when there's more than one permissible answer. And in every single case, an application for a zone map change, an application for a plan amendment, an application for a zoning variance that the authorities either can or can't allow. And I think that's a key difference, that there aren't any moratorium cases in the cases that are discussed. And I think that takes care of, at least from our standpoint, the Williamson issue as well. Well, tell me again why you don't apply now? Because you don't want to build what you originally wanted to because the moratorium and other factors have made it economically feasible. Well, part of the city's corrective plan, and that was mandatory in order to pass the moratorium ordinance in the first place. Part of the plan is to await the I-5 bridge alignment. We still don't have that. And Palmer, the appraiser, his declaration is in the record, and Dietrich, who's the principal of Thunderbird Hotel, said no one will buy the property for development, no one will finance it if we wanted to do it ourself, given the uncertainties of this process. The excerpts have a couple of overhead pictures showing a good part of the property will be taken up by the new bridge. And again, they own that bridge planning process by making it part of the corrective plan. And the statute, which we quote at page two of the addendum, requires the city, if it adopts a moratorium on construction or land development, to adopt, and I'm quoting, a program to correct the problem creating the moratorium. Well, there's their plan, and it's still not corrected. That, we believe, is what drives this even now. Certainly, during the moratorium period, it would have been, again, a waste of nearly a million dollars to test the moratorium, other than in the way the statute says. You're not claiming, ultimately, compensation for that period of time that the moratorium was in effect. Well, it did preclude development. And even as that- You're saying that the moratorium, along with these other factors, destroyed the value of the property. That is correct. But it's not that period of time. You're not saying- No. And the only reason this was emphasized so much in the first part of the argument is because the city, at one point, argues, well, you should have just gone ahead and challenged the moratorium by asking the city to permit the big box that it wouldn't let you do. Or you should have done it after the moratorium was invalidated. Just to make this concrete, with no pun intended, you're saying that first the moratorium, now the Interstate 5 project, have essentially destroyed any use for this property. So the measure of damages that you want to come in and establish in federal court are measured how? It would be measured by the value of the right that was taken. In this case, the right to develop. There was a $25 million agreement to sell to a national retailer, Walmart. A couple of years before that agreement was entered into, Thunderbird paid $20 million for the property. So it's going to be in that vicinity. And say if this case goes back to the district court, and there's a trial either on the state claim or the federal claim, and there's an award based on taking of the development rights, then Thunderbird doesn't have the development rights anymore. It's the city's. Well, you mean there are two different kinds of takings claims potentially available here. One is an actual taking, and the other is a regulatory taking. This looks to me at the moment like a regulatory taking case. It is. So you'd value the right that was taken, which essentially would be the full value of the property. But you need to show, which you have not yet shown, which is part of the problem, what exactly is the diminution in value affected by the regulatory action? Well, it's large, and the court never reached the question of whether there was a taking or not. So I think there's enough evidence in there to indicate that the right taken was of considerable value, given the undisputed evidence. Well, but you see, taken is a term of art. Diminution in value doesn't mean anything was taken in the sense of taking. Right. There has to be a huge amount that's taken before you have a, quote, takings claim. And that's what we don't know. I think there's enough there. I know you do. If there are any more questions, I think it's time to stop. Thank you. Thank both sides for your useful arguments. Thank you. That is the last case on the calendar. We submit Thunderbird Hotels v. City of Portland. And we're now finished for the day. We will reconvene tomorrow morning at 8.30 tomorrow morning.
judges: Jones, Fletcher W. , Fisher